IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FILED

JUN 2 0 2003

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | |
|---|---|
| DEBBIE RHODES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CASE NO. 02-A-620-N |
| | ) |
| SOUTHEAST WAFFLES, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

SOUTHEAST WAFFLE, LLC'S
MEMORANDUM OF FACTS AND LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

I. INTRODUCTION

This case does not involve the kind of extensive, long-lasting, unredressed, and uninhibited conduct that the federal courts have typically found to be actionable sexual harassment. At most, plaintiff Debbie Rhodes ("Rhodes") can only produce evidence of isolated, unreported incidents involving, at worst, boorish and immature behavior. Accordingly, summary judgment is warranted.

II. NARRATIVE STATEMENT OF UNDISPUTED FACTS[1]

A.     Defendant's Operations.

Defendant, Southeast Waffles, LLC (hereinafter referred to as "Waffle House"), headquartered in Nashville, Tennessee, is a franchisee of Waffle House restaurants. (Yancey Aff. ¶ 1). Since 1999,[2] it has owned and operated the two Waffle House restaurants in Prattville, Alabama, that are at issue in this case: Units # 262 and # 801. (Yancey Aff. ¶ 1).

Each Waffle House restaurant typically has a unit manager, a cook, and several servers. (Pl's

---

[1] Most of the facts set forth in this brief are based on Rhodes' deposition testimony and are assumed to be true, but only for the purpose of defendant's motion for summary judgment.

[2] Treetop Enterprises, Inc. ("Treetop"), owned Units # 262 and # 801 prior to Waffle House's purchase in 1999. (Yancey Aff. ¶ 1).

Dep. 42-45). The unit manager is in charge of the restaurant. (Pl's Dep. 44, 45). While Waffle House restaurants are open seven days a week, unit managers typically only work five out of those seven days. (Pl's Dep. 45). The management of the restaurant the other two days is handled by a "District Relief Manager" who travels from restaurant to restaurant to cover the two days not worked by the unit manager. (Pl's Dep. 47-48; 118-119).

B.    Waffle House's Harassment Policies and Procedures

Waffle House has a policy that strictly prohibits sexual harassment. Waffle House communicates this policy to its employees in several different ways:

- Waffle House presents a copy of its "Discrimination and Harassment Policy" to each newly hired employee. (Yancey Aff. ¶ 2). Each new employee signs a document acknowledging that he or she has received and read the policy.

- Waffle House posts the policy on an employee bulletin board located in each unit. (Yancey Aff. ¶ 2).

- Waffle House posts a notice providing a toll-free phone number that employees can call to report incidents of sexual harassment. (Yancey Aff. ¶ 2; Def's Ex. 11).

- Finally, Waffle House's anti-discrimination, anti-harassment policies, and the toll-free phone number, are placed in each paycheck its employees receive. (Yancey Aff. ¶ 2).

C.    Plaintiff's Employment at Treetop and Waffle House

Between September 1998 and August 2001, Rhodes worked at Unit #262 as a server on four

different occasions, voluntarily coming and going for reasons not germane to this action.[3] (Pl's Dep. 14-15, 24, 30-31, 38, 41-43;Def Ex. 4).

             1.      Rhodes' First Round of Employment at Unit #262

When Rhodes first started to work at Unit #262, owned at that time by Treetop,  she signed an application that called attention to the law regarding employment discrimination and referenced Treetop's policy prohibiting any type of discrimination. (Rhodes Dep. 18, Def. Exs. 1 and 2). At the time of hiring, Rhodes received a copy of Treetop's Discrimination and Harassment Policy, which specifically provided as follows:[4]

**HARASSMENT**

> No employee will be subjected to harassment based on **sex, age, race, color, disability, religion, national origin**, or any other status protected by state or federal law, by Treetop employees, customers, or by other persons doing business with the company.  Inappropriate physical contact, slurs, offensive jokes, insinuation, innuendo, or any similar conduct which interferes with work performance or creates an intimidating or offensive working situation will not be tolerated in the workplace.

Treetop further advised her that she had an obligation to report any form of discrimination and was told that she could be subjected to disciplinary action for the failure to do so:

**REPORTING, INVESTIGATING & RESOLUTION**

> ... **Employees having knowledge of any harassment who do not promptly report such circumstances may, therefore, be subject to disciplinary action as well as persons found to be directly involved.**

Rhodes signed a copy of Treetop's "Discrimination and Harassment Policy" on September 2, 1998, wherein she confirmed, "I have read and understand the above and I agree to abide by these

------------------------------------------------

[3] Rhodes last and final period of employment at Waffles Unit #262 was between April and August 2001.  It was during this last term of employment that Rhodes alleges she was subjected to a "sexually hostile work environment."

[4] As shown below, Waffle House's polices are identical to Treetop's.  For convenience, they will be reproduced only once.

policies." (Rhodes Dep. 17; Def. Ex. 2). In addition to reading the policy, Rhodes understood that

harassment and discrimination were not tolerated at Unit #262:

> Q.   You were aware when you worked at Treetop Enterprises,
> Inc., for that Waffle House owned by Treetop that they had a
> policy against any kind of discrimination?
>
> A.   Right. My boss, Joe Tidwell, at the time was solely against
> any kind of stuff like that, and I felt like if I had a problem,
> yes, I could got to him.

(Rhodes Dep. 18).

During her initial employment at Unit #262, Treetop gave Rhodes a copy of its "Employee

Conduct Policy," which specifically described the standards of conduct the company expected of

its employees. (Def's Ex. 3).   Treetop's "Employee Conduct Policy" specifically prohibited

discrimination of any type and provided that the failure to report any acts of discrimination would

violate Rule 17, which could result in discharge or other disciplinary action.  Rule 17 reads as

follows:

> 17.   Discrimination or harassment against a guest or fellow employee because of
> race, color, age, religion, sex, national origin, or handicap.  Failing to report to
> management any acts of discrimination/harassment including acts by members of
> management to their superiors.

(Def's Ex. 3).

Finally, Treetop as well as Waffle House, provided a toll-free number employees could use

if they believed they were the victims of discrimination or sexual harassment. (Def's Ex. 2, 3, & 5).

Rhodes was aware of this number and knew that if she ever felt she had been the victim of sexual

harassment or discrimination, she could call the number. (Pl's Dep. 19-20).

> 2.   Rhodes' Second Round of Employment at Unit #262

Following a four-week break in service in the fall of 1999, Rhodes returned in November

1999 for the second time to work as a server at Unit #262.  (Pl's Dep. 24).  By this time, Waffle

House had purchased and was operating Unit #262.  Consequently, when Rhodes returned to work on this occasion, Waffle House presented Rhodes with a new application, virtually identical to the one she provided to Treetop. (Pl's Dep. 26).  (The only difference between the two applications was that the name "Southeast Waffles, LLC" had been substituted for that of Treetop in the upper left-hand corner.)  Waffle House also presented Rhodes with another "Discrimination and Harassment Policy," which, like the application, was virtually identical to Treetop's. (Def's Exs. 2 & 5).  It fact, it had the same toll-free number printed in the middle of the page as that used by Treetop. (Def's Ex. 5).

Despite Rhodes' contention during her deposition that she did not sign Waffle House's "Discrimination and Harassment Policy" prior to her second round of employment, and that no one "explained it to her," she nevertheless knew that discrimination at Waffle House "wasn't tolerated." (Pl's Dep. 27).  Moreover, Rhodes read Waffle House's "Employee Conduct Policy," which contains the same Rule No. 17 prohibiting discrimination and harassment as Treetop's. (Pl's Dep. 29-30; Def's Exs. 3 & 6).

### 3.   Rhodes' Third Round of Employment at Unit #262

Between January 2000 and June 2000, Rhodes had a six-month break in service at Waffle House. (Pl's Dep. 30-31).  Upon returning to work at Unit #262 for the third time in June 2000, Waffle House again made her aware of its harassment and discrimination policies.  Rhodes again signed Waffle House's "Discrimination and Harassment Policy," which was the same as the other two policies previously presented to her. (Def's Exs. 2, 5, & 9).  Rhodes also received and signed Waffle House's "Employee Conduct Policy;" again the same policy she had received and signed on the two previous occasions she had worked at Unit #262. (Pl's Dep. 35-36).

In addition to the policies given to new employees, Waffle House had a poster in Unit #262

-5-

(Def's Ex. 11) that outlined its anti-harassment policy and republished the toll-free number. While Rhodes did not recall seeing such a posting on the bulletin board, she did, however, confirm that all of the company policies described above have been in place the entire time she worked at Unit #262 and that she knew Waffle House had a toll-free number. (Pl's Dep. 19-20, 35, 37).

### 4. Rhodes Fourth and Final Round of Employment at Unit #262

In August 2000, Rhodes had another break in service but returned to Unit #262 in March 2001 and worked for one week. Rhodes then returned in April 2001 and worked until she quit on or around August 31, 2001. (Rhodes Dep. 41-43).

In or around August 2001, Sheri Sherrill,[5] Rhodes' unit manager at Unit #262, called her into her office to discuss the fact that she needed to start working on the weekends because the other servers were complaining that Rhodes did not work on the weekends. (Pl's Dep. 58). Sherrill told Rhodes she would need to seek other employment if she could not work on the weekends. (Pl's Dep. 58). Though it is unclear whether Rhodes told Sherrill her reason for not working weekends, Rhodes explained in her deposition that she did not work weekends because of child care obligations. (Pl's Dep. 58-59). Specifically, it was difficult for Rhodes to coordinate her work schedule with that of her two daughters so as to care for her young child.[6] (Pl's Dep. 58-59).

Sometime after this meeting with Sherrill[7], Rhodes' daughter Christina, who worked in Unit

---

[5] Sheri Sherrill recently wed and was formally known as Sheri Rucker. Defendant will use "Sherrill" in this brief.

[6] Rhodes also had a thirteen-year old son, but she felt that he was not old enough to care for a young child. (Pl's Dep. 38-39).

[7] The record is not entirely clear whether the discussions with Charles James and Henry Higginbotham occurred after Rhodes' discussion with Sherrill, but it appears, based on Rhodes' conversations with Henry, that her request to transfer to Unit #801 was in response to Sherrill statement that if she could not work weekends, she would need to find other employment.

801 in Prattville, told her that the unit manager, Charles Jones (Sherrill Aff. ¶ 1) needed help on the first shift. (Pl's Dep. 49). Rhodes was interested in transferring because she and Christina could work alternate weekends. (Pl's Dep. 49). Rhodes asked Jones about transferring to Unit #801, and he replied that she would need to check with Sherrill. (Pl's Dep. 49). Rhodes spoke to Sherrill about the possibility of transferring, and she "didn't have a problem with it." (Pl's Dep. 49). Rhodes then spoke with Henry Higginbotham, the district manager (Sherrill Aff ¶ 1) about transferring to Unit #801. (Pl's Dep. 50). He told her that his concern was that there would be times that Jones would need both her and her daughter to work on the same weekend. (Pl's Dep. 50). Higginbotham nonetheless offered Rhodes a few nights on the weekends, but Rhodes rejected this proposal because she felt it would not solve her child care problem. (Pl's Dep. 59-60). Jones eventually offered her a night shift, but she could not take that either because of her child. (Pl's Dep. 62-63).

Despite Higginbotham's and Jones' attempts to work with her schedule, Rhodes became frustrated, feeling Charles and Henry were giving her the "runaround." (Pl's Dep. 52). This "runaround," however, had nothing to do with Paul's alleged harassment because Rhodes never complained to Higginbotham or Jones about his conduct, and Paul had no input whatsoever in making Rhodes' work schedule. (Pl's Dep. 123).

Rhodes did work at Unit #801, albeit briefly, on her last day of employment. (Pl's Dep. 53-54). On or around August 31, 2001, plaintiff arrived at Unit #801, but Jones immediately transferred her to Unit #262 because no one had shown up to work. (Pl's Dep. 53-54). Rhodes did as Jones requested and worked on that day at Unit #262. Although she completed that day's work, she never worked another day at any location of Waffle House and never contacted anyone at Waffle House about returning to work on getting placed back on the schedule at Unit #262.. (At Rhodes' request,

-7-

Sherrill had previously removed her from the schedule at Unit #262 in anticipation of the transfer to Unit #801.) (Sherrill Aff. ¶ 4).

    C.    <u>The Alleged Sexual Harassment</u>

As a district relief manager, Paul only worked at Unit #262 occasionally. (Yancey Aff. ¶ 3-4). Between April 11, 2001 and August 31, 2001, the last day of Rhodes' work at Unit #262, a period in excess of 140 days, Paul and Rhodes only worked in Unit #262 together on the same eight hour shift twenty times. (Yancey Aff. ¶ 3-4). Rhodes testified that another relief manager, Crystal Hill, worked in Unit # 262 a few times. (Rhodes Dep. 87).

Rhodes contends that during the infrequent occasions when she and Paul worked at Unit #262, he engaged in seven incidents of sexual harassment. With the exception of one incident, Paul's comments occurred in the public areas of Unit #262 and some of the comments were specifically directed to men and women. Paul never threatened or touched Rhodes while making his comments. (Rhodes Dep. 155). Not once during the twenty-shift period of time Rhodes and Paul worked together, did Rhodes use the Waffle House's toll-free phone number or complain to the unit manager, Sherrill or the district manager, Higginbotham. At most, Rhodes told Sherrill about Paul's "joking around and embarrassing us," but she admits she never gave Sherrill any specifics. (Rhodes Dep. 89-90). (Sherrill testifies that Rhodes told her only that she "did not like" Paul. (Sherrill Aff. ¶ 3)). Sherrill did not receive any complaints from other employees about Paul's conduct. (Sherrill Aff. ¶ 3).

The seven incidents of alleged harassment are described below, and for purposes of summary judgment assumed to be true.[8]

---

[8] Unless dated, these events are not in chronological order because, for the most part, Rhodes could not remember when they occurred.

Incident No. 1

One day after Paul left the restaurant, Rhodes heard Leigh Atteberry, a co-worker, exclaim, "Oh, my God, I don't believe this!" (Pl's Dep. 82). Rhodes then looked up and saw Paul in front of the window simulating sexual intercourse.[9] (Pl's Dep. 82-83). At the time, there were customers in the restaurant. (Pl's Dep. 82-83). Rhodes did not know what "possessed" Paul to do this, but the whole incident did not last long and was not directed at her in particular but to everyone in the restaurant. (Pl's Dep. 82-83). Rhodes did not complain to anyone about Paul's conduct.

Incident No. 2

On or around July 21, 2001, Rhodes and Butch Snyder, a man she dated, were eating in Unit #801 on their day off. (Pl's Dep. 112-113, 155-156). Paul walked by and looked at the two of them and made a comment about the three of them sleeping in a "triple bed." (Pl's Dep. 113). Rhodes replied, "don't want to go there." (Pl's Dep. 113). Rhodes testified that this incident was not "severe," but only embarrassing. (Rhodes Dep. 112). Rhodes did not complain to anyone about Paul's comment. (Pl's Dep. 114).

Incident No. 3

On another occasion when Rhodes and Snyder were not working and eating, this time, in Unit # 262, Paul approached them and said, "I bet you $5 I can put my sex organs on my shoulders." (Pl's Def. 84). Rhodes "looked at him, like 'what?'" (Pl's Dep. 84). Laughing, Paul then turned his head, stuck his tongue out and placed it on his shoulder. (Pl's Dep. 84). Rhodes did not tell any manager or supervisor about Paul's joke. (Pl's Dep. 88).[10]

---

[9] Or, to use Rhodes' own words, "humping the window." (Rhodes Dep. 82).

[10]The record does not indicate whether Snyder complained about Paul's comments, but Sherrill testifies in her affidavit that she received no complaints regarding Paul. (Sherrill Aff ¶ 3).

Incident No. 4

On another occasion (Rhodes could not recall when), Paul made a comment that he had f__ed his girlfriend so bad that it caused her eyes to pop out, and accordingly, she was "keeping an eye on him." (Pl's Dep. 99).  Paul told this joke on the floor of the restaurant in the presence of other employees and customers. (Pl's Dep. 100). Rhodes did not complain to anyone about Paul's comment.

Incident No. 5

One day, while Paul was sitting in a chair in the manager's office, and Rhodes was standing about a foot or two away, he leaned over and made a "sniffing noise." (Pl's Dep. 93).  Paul said nothing to Rhodes and did not touch her.  Later, Rhodes overheard Paul tell another employee that he could tell if a girl had been f___ed by the way she smelled. (Pl's Dep. 91-92).  Rhodes did not complain to anyone about Paul's "sniffing" or his comment to the other employee. (Pl's Dep. 94).

Incident No. 6

While Rhodes was sitting at the counter shortly after she had gotten off work, Paul made a comment to Melissa Stubbs as she walked into the restaurant. (Pl's Dep. 105).  Paul told Stubbs, who had recently had a baby, that she did not have a butt since having her baby. (Pl's Dep. 105).  Paul said some "other stuff" to Stubbs, but Rhodes could not hear what was said. (Pl's Dep. 106).  Despite being offended by Paul's comments, Rhodes told no one about Paul's comment. (Pl's Dep. 106).

Incident No. 7

On her last day of work at Waffle House on or around August 31, 2001, while Rhodes was finishing up the dishes just before she clocked out at 2:00 PM, Rhodes overheard Paul in the public area of the restaurant tell one of his "little jokes" to Tommy Lockhart, a male employee while other

-10-

employees were present as well. (Pl's Dep. 96, 97). Though Rhodes could not remember the exact words, the joke went something like this: Paul told Lockhart, "I can show you the cheapest date." Paul then took a package of crackers, some butter, a tea bag, and a hot cup of water. (Pl's Def. 96). He then told Lockhart, here's their meal and after they are done, it is time for them to furnish the rest. (Pl's Dep. 96). After hearing this nonsensical joke, Rhodes told Paul to "stop," but she did not tell any manager or supervisor about the joke. (Pl's Dep. 98-99).

## III. ARGUMENT

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 mandates summary judgment when, under the standards applied by the substantive law, no substantial evidence establishes a material issue of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In order to defeat summary judgment, the plaintiff may not rest merely on her pleadings, but must present admissible evidence that raises a genuine issue of material fact. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient. . . ." Id. at 252 (internal citations omitted); see Matsushita Electronics Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 581 (1986) (holding that in context of summary judgment evidence "must do more than simply show that there is some metaphysical doubt as to the material facts").

### B.   Plaintiff Cannot Establish a Hostile Environment Claim Because Paul's Conduct Was Not Severe or Pervasive

Title VII is neither "a general civility code" nor "designed to purge the workplace of vulgarity." Oncale v. Sundowner Offshore Svcs., Inc., 523 U.S. 75, 81 (1998); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 429 (7th Cir. 1995); see Blevins v. Heilig-Meyers Corp., 52 F.Supp.2d 1337, 1350-51 (M.D. Ala. 1998) (stating that Title VII does not guarantee refinement and

-11-

sophistication in the workplace);cf. Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986), (emphasizing that not all workplace conduct that has sexual overtones can be characterized as harassment forbidden by Title VII). Thus, in a hostile environment case, an employee must prove that the conduct at issue is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment."[11]  This element of proof is regarded as "crucial." Oncale v. Sundowner Offshore Svcs., Inc., 523 U.S. 75, 81 (1998); see also Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000) (observing that severe or pervasive element is one that "tests the mettle of most sexual harassment claims"). In order to establish this "crucial" element, a plaintiff must "subjectively perceive" the offending conduct as severe or pervasive and such belief must be "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Mendoza, 195 F.3d at 1246 (internal quotations omitted).

While the line between conduct severe enough to constitute sexual harassment and a mere unpleasant working environment is not easily drawn, there are guide posts that help one survey the boundaries:

> On one side lies sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; [and] pornographic pictures. * * * On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

Baskerville, 50 F.3d at 430 (Posner, J.).

---

[11]    Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). The other elements necessary to establish a claim for hostile-environment sexual harassment are: 1) plaintiff belongs to a protected group; 2) plaintiff was subjected to unwelcome sexual harassment; 3) the harassment was based upon her sex; 4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment; and 5) there is a basis for holding the employer responsible under either a theory of vicarious liability or direct liability. For purposes of summary judgment, the first two elements are not in dispute. The third element is discussed in this section and the fifth in section III. D. below

For several reasons, the "line" in this case is easily drawn because Paul's conduct falls well within the realm of merely offensive, rather than sexually harassing, conduct. Admittedly, Paul's conduct was base, coarse, crass, crude, vulgar, and unrefined. Nevertheless, a reasonable person would not, based on all the circumstances, find that Paul's comments were so severe or pervasive as to constitute a violation of Title VII.

During the course of her relatively short period of time at Unit # 262 (*i.e.*, April to August 2001), Rhodes worked with Paul on only twenty nonconsecutive shifts. Accordingly, the alleged harassment was hardly a nonstop barrage; as Rhodes admitted, some days Paul was "quiet." (Rhodes Dep. 172). During these isolated occasions, Paul never made any physically threatening remarks, never requested sexual favors from Rhodes (the "triple bed" comment cannot be taken as a serious proposition), never threatened her job, or attempted to touch her in any manner. Consequently, the seven incidents of offensive conduct of which Rhodes complains were simply too episodic to be sufficiently severe or pervasive for purposes of Title VII.   See Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 534 (7th Cir. 1993) (holding that although comments and conduct were "undoubtedly inappropriate, [they were] not so severe or pervasive as to create an objectively hostile work environment"). Leiting v. Goodyear Tire & Rubber Co., 117 F.Supp2d 950, 963 (D. Neb. 2000) ("Isolated incidents generally cannot amount to severe or pervasive harassment.").

Paul's comments and jokes were never so severe or pervasive that Rhodes felt compelled to complain sufficiently to anyone at Waffle House because, for the most part, Rhodes was merely "embarrassed" by it.   Throughout her deposition, Rhodes used the term "embarrassed" or "embarrassing" to describe how she felt about Paul's comments. (Rhodes Dep 81, 82, 83, 87, 89, and 100). Not once did she refer to Paul's conduct as "threatening" or "intimidating." Only once

-13-

did she refer to his conduct as humiliating and that was only in response to a question asked by her own attorney. (Rhodes Dep. 171-72). When asked during cross examination about her claim in paragraph six of her Complaint that she suffered humiliation, she referred to her visit to Unit #801 after she quit, and not because of Paul's conduct. (Rhodes Dep. 126).  At least one incident—the triple bed comment—was in Rhodes own words, not severe, and Rhodes quick retort, "don't go there," indicates she was not terribly offended by it.

While Paul's conduct may have been "embarrassing," it was not discrimination under Title VII. See Carr v. Allison Gas Turbine Div., GMC, 32 F.3d 1007, 1010 (7th Cir. 1994) ("employers are not under a legal duty enforceable by suits under Title VII to purify the language of the workplace.")  Simply put, Paul's immature and boorish behavior was just that, and nothing more. Other federal courts have addressed cases of sexual harassment involving conduct certainly more egregious than  this one, and yet have *not* found sexual harassment under Title VII.  See Shepherd v. Comptroller of Public Accounts of Texas, 168 F.3d 871, 872-75 (5th Cir.1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264-67 (5th Cir.1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir.1998) (holding that statement that plaintiff had the "sleekest ass" in office and "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); Adusumilli v. City of Chicago, 164 F.3d 353, 357 (7th Cir.1998) (holding actions insufficient to support hostile

-14-

environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1365-66 (10th Cir.1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-54 (4th Cir.1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24 (6th Cir.1997) (holding conduct insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns;" suggesting land area be named as "Titsville" or "Twin Peaks;" asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?;" stating, "Just get the broad to sign it;" telling plaintiff she was "paid great money for a woman;" laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); Baskerville, 50 F.3d at 430 (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); Kidwai v. McDonald's Corp., 1994 U.S. App. LEXIS 7799, No. 93-1720 (4th Cir. April 18, 1994) (holding insufficient seven incidents, including one instance in which

-15-

harasser asked plaintiff whether "she was in bed with someone"); <u>Weiss v. Coca-Cola Bottling Co.</u> <u>of Chicago</u>, 990 F.2d 333, 337 (7th Cir.1993) (holding plaintiff's claims--supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work--were not sufficient for actionable sexual harassment); <u>Willets v. Interstate Hotels, LLC</u>, 204 F.Supp. 2d 1334, 1337 (M.D. Fla. 2002) (holding that during seven-year period, harasser's hugging plaintiff in sexualized manner, rubbing his head and shoulders frequently, indicating that he loved him, and placing his hand on the inside of plaintiff's thigh near his crotch did not constitute sexual harassment).

C.   Paul's Alleged Harassment Was Not "Because of Sex"

Sexual harassment, like any other claim under Title VII, is a claim based on intentional discrimination.  <u>See</u> <u>Oncale v. Sundowner Offshore Svcs., Inc.</u>, 523 U.S. 75, 80 (1998) ("We have never held that workplace harassment . . . is automatically discrimination because of sex merely because the words used have sexual content or connotations."); <u>Clover v. Total System Servs., Inc.</u>, 176 F.3d 1346, 1351 (11th Cir. 1999) (plaintiff must establish that harassment occurred because of her sex); <u>Mendoza</u>, 195 F.3d at 1248 n. 5 (stating that plaintiff must show that but for her sex she would not have been object of harassment); <u>Stahl v. Sun Microsystems, Inc.</u>, 19 F.3d 533, 538 (10th Cir. 1994) ("If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of the environment."); <u>Breda</u> <u>v. Wolf Camera, Inc.</u>, 148 F.Supp.2d 1371, 1375 (S.D. Ga. 2001) ("If sexual conduct is placed in issue, it must not be merely tinged with offensive connotations, but actually [be shown to have] actually constituted discrimination because of sex.") (internal quotations and citations omitted).

While Paul's conduct was obviously of a sexual nature, there is nothing in the record

-16-

indicating that the purpose of such conduct was to discriminate on the basis of *sex or gender*. Paul's conduct was, for the most part, not directed specifically at Rhodes, but to whomever was present at the time, male or female, customer or non-customer. In fact, there was a certain degree of randomness to Paul's behavior, indicating that he lacked a discriminatory agenda. Even Rhodes recognized this:

> Well, some days he was quiet, you know. Kind of mellowed out a little bit. And then other days, it seemed like he wanted tell all kinds of jokes, you know, and some of them strictly came out of left field.

(Rhodes Dep. 172).

While comments need not be directed at a plaintiff in order to constitute hostile-environment sexual harassment, the converse is nonetheless relevant. Sexual harassment that is not particularly directed at a plaintiff is weak evidence of intentional discrimination. See Black v. Zaring Homes, Inc., 104 F.3d 822, 826 (6th Cir. 1997) (finding fact that sexually charged comments not directed at plaintiff supported summary judgment); Rennie v. Dalton, 3 F3d 1100, 1107 (7th Cir. 1993) (affirming summary judgment where off-color joke and comment regarding strip bar were not directed at plaintiff personally). In other words, there is a distinct difference between offensive comments made to the world writ large and those delivered directly to an individual with the purpose to intimidate and demean on the basis of sex. See Baskerville, 50 F.3d at 431. ("Remarks innocuous or merely mildly offensive when delivered in a public setting might acquire a sinister case when delivered in the suggestive isolation of a hotel room."). See Fitzpatrick v. Winn-Dixie Montgomery, 153 F. Supp. 2d 1303, 1306 (M.D. Ala. 2001) (no sexual harassment where a supervisor makes sexual overtures to employees of both genders, or where the conduct is equally offensive to male and female workers, because men and women are accorded like treatment) (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)); see also Succar v. Dade

County School Bd., 229 F.3d 1343, 1345 (11th Cir. 2000) (holding that harassment of plaintiff was not the result of gender)

      The window incident occurred in the presence of men and women, not to mention the whole restaurant, and Rhodes admitted that the incident was not directed towards her but "everybody." (Pl's Dep. 82). Paul told the cheap date joke to a male employee, which Rhodes just happened to overhear.  Likewise, Paul advertised his alleged sexual prowess to the whole restaurant, filled, no doubt, with men and women. The sex organ and triple bed jokes were made while Rhodes was sitting next to male friend Butch Snyder.  The only act that Paul made that was directed solely at plaintiff was the "sniffing" incident, but this alone does not constitute discrimination in the form of sexual harassment.  See Williams v. Russell Corp., 218 F. Supp. 2d 1283, 1296 (M.D. Ala. 2002) (stating that isolated act of offensive conduct, standing along, is not necessarily harassment because sexual harassment by its "very nature involves repeated conduct").  Paul's conduct was more akin to someone whose "sense of humor took final shape in adolescence" (Baskerville, 50 F.3d at 431) than one who targeted women for extensive hazing in order to demean and denigrate their importance in the workplace.  Paul may have been an immature boor, but he was an equal opportunity boor, and therefore, not discriminating on the basis of sex.

      The only possible evidence Rhodes could arguably point to as support that Paul's conduct was discriminatory harassment is his comment to Melissa Stubbs. The mere fact that Paul's single comment to Stubbs is gender specific, because only women have children, it does not necessarily create a hostile environment intended to discriminate against women. Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1167-68 (7th Cir.1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient because not necessarily gender-related).  While Waffle House recognizes that Rhodes may support a hostile environment

-18-

claim by pointing to Paul's conduct toward other women, she may rely only on evidence relating to harassment of which she was unaware. See Hirase-Doi v. U.S. West Comms., Inc., 61 F.3d 377, 782 (10th Cir. 1995); see Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995) (affirming summary judgment for defendants on hostile work environment claim because plaintiff was not aware of incidents of racial discrimination until after termination). Rhodes testified that Paul "said some stuff" to Stubbs that she could not hear. (Rhodes Dep. 106). Though Rhodes contends further that Stubbs "walked out" because of Paul, she has no first-hand knowledge why Stubbs walked out. The only basis for this contention were rumors. (Rhodes Dep. 107). Rhodes further admitted that she never talked to Stubbs about the incident with Paul. (Rhodes Dep. 108).

D.   Waffle House Cannot Be Held Vicariously Liable Because Rhodes Suffered No Tangible Employment Action.[12]

Assuming for purposes of summary judgment that Paul's conduct constituted hostile-environment sexual harassment, Waffle House can be vicariously liable under *only if* Paul's alleged harassment resulted in a "tangible employment action."Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  Otherwise, Waffle House may assert what is known as the "Faragher Defense," discussed below.[13]

---

[12]    Waffle House will concede, for purposes of its motion for summary judgment, that Paul was a supervisor under Title VII.

[13]The federal courts are split over whether the Faragher defense is available when the tangible employment action at issue is constructive discharge. Compare Suders v. Easton, 325 F.3d 432, 454 (3d Cir. 2003) (holding that constructive discharge constitutes "tangible employment action" for purposes of Faragher defense); Jaros v. LodgeNet Entertainment Corp., 294 F.3d 960, 966 (8th Cir. 2002);Vasquez v. Artrium Door & Window Co. of Arizona, Inc., 218 F.Supp. 2d 1139, 1142 (D. Ariz. 2002) (same); Cherry v. Menard, Inc., 101 F.Supp. 2d 1160, 1171, 1176 (N.D. Iowa 2000) (same); Haworth v. Romania Imported Motors, Inc., No. CV 00-1721, 2001 WL 34041893, at 8* (D. Or. Dec. 27, 2001); Taylor v. United Regional Health Care System, Inc., No. CIV.A. 700CV145-R, 2001 WL 1012803, at 6* (N.D. Tex. Aug. 14, 2001) (same), with Mallinson-Montague v. Pocrnick, 224 F.3d 1224, 1231-32 (10th Cri. 2000) (refusing to merge tangible employment action analysis with constructive discharge); Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 294 (2d Cir. 1999) (holding that constructive discharge did not constitute tangible employment action for purposes of Faragher defense); EEOC v. Barton Protective Svcs., Inc., 47 F.Supp. 2d 57, 59 (D.D.C. 1999) (same); Turner v. Dowbrands, Inc., No. 99-3984, 2000 WL 924599, at 1* (6th Cir. Jun. 26, 2000); Scott v. Ameritex Yarn, 72 F. Supp.2d 587, 594 (D.S.C. 1999) (same); Desmarteau v. City of Wichita, 64 F.Supp. 2d 1067, 1079 (D. Kan.

Rhodes alleges that Paul's alleged sexual harassment caused her to quit Waffle House, thereby resulting in a tangible employment action. (Compl ¶ 14; Rhodes' Dep. 51, 125-126). To establish constructive discharge, however, Rhodes must prove that her working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign. Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991). Because, as shown above, the conduct of which Rhodes complains did not constitute actionable sexual harassment, her claim for constructive discharge likewise fails. See Pittman v. Hattiesburg Municipal Separate Sch. Dist., 644 F.2d 1071, 1077 (5th Cir. 1981) (holding that plaintiff must demonstrate greater severity or pervasiveness than minimum required to prove underlying claim of hostile environment).

Even if Paul's conduct somehow constituted sexual harassment, such conduct did not make the working environment in which plaintiff found herself in or about August 2001 so intolerable that a reasonable person would have quit. Rhodes admitted in her deposition that Paul's conduct never prevented her from performing her job, but only made her feel "uncomfortable" or "embarrassed." (Rhodes' Dep. 121). See Williams, 218 F. Supp. 2d at 1299-1300 (holding no retaliatory constructive discharge where employee stated the she felt "uncomfortable" working around alleged harasser). There are many things one must experience in the American workplace that may be "uncomfortable" or "embarrassing" but nonetheless do not result in constitute constructive discharge. See Bolden v. PRC, Inc., 43 F.3d 545, 552 (10th Cir. 1994) ("[N]ot every unhappy employee has an actionable claim of constructive discharge."); cf. Baskerville, 50 F.3d at 430 ("The

---

1999) (same); Alberter v. McDonald's Corp, 70 F.Supp.2d 1138, 1147 (D. Nev. 1999) (same). It does not appear that the Eleventh Circuit has not weighed in on this issue. This court, in Reynolds v. Golden Corral Corp., 106 F.Supp.2d 1243, 1249 n.2 (M.D. Ala. 1999), appeared to take the view that the Faragher defense is available when the tangible employment action is constructive discharge. Waffle House asserts that there is no constructive discharge because Rhodes failed to take advantage of its policies designed to prevent harassment. Because such an argument is the functional equivalent of a Faragher defense, merely approached from a different angle, this Court need not join the fray.

concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women."). Courts have refused to find constructive discharge in situations for worse than the one presented here. <u>Alagna v. Smithville R-II Sch. Dist.</u>, 324 F.3d 975 (8th Cir. 2003) (no constructive discharge where alleged harasser told the plaintiff "I love you" on several occasions, telephoned the plaintiff's home over twenty times, constantly discussed his failed relationships with the plaintiff while "moving close to [plaintiff], touching her arm, looking her up and down, and saying that he 'loved' her and that she was 'very special,'" and placed two romance novels in plaintiff's workplace mailbox); <u>Duncan v. GMC</u>, 300 F.3d 928, 935-36 (8th Cir. 2002) (holding that four or five propositions for sexual relationship; requiring use of computer with nude woman as screen saver; request to draw picture of sexually suggestive planter; request to type "rules" for imaginary "women haters" club; and touching plaintiff's hand on several occasions was certainly "boorish, chauvinistic, and decidedly immature," but not sexual harassment that would force reasonable person to quit); <u>Pesso v. Montgomery Gen. Hosp.</u>, 1999 U.S. App. LEXIS 10207 (4th Cir. 1999) (no constructive discharge where alleged harasser asked plaintiff if he wanted to get a hotel room at a conference, wondered aloud what the plaintiff would "taste like," asked "Were you always this handsome?"; "Were you always popular with the girls?"; and "What sports did you play in high school?," told plaintiff that he "should be in GQ Magazine with that tan," and rubbed plaintiff's upper arm, telling him that he "looked as good as ever").

Rhodes' constructive discharge claim also fails because she quit before she gave Waffle House the opportunity rectify the situation. <u>Kilgore v. Thompson & Brock Mgmt, Inc.</u>, 93 F.3d 752 (11th Cir. 1996); <u>see</u> <u>Woods v. Delta Bev. Group, Inc.</u>, 274 F.3d 295, 301 (5th Cir. 2001) (no hostile working environment and no constructive discharge where plaintiff had "an obligation to give the company another opportunity to remedy the problem before deciding that she could not work there

-21-

anymore."). An employee working in an environment he or she finds offensive cannot "assume the worse" and quit, without allowing the employer the opportunity to address and remedy the situation. Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996). As shown below in section III E.2., Rhodes failed to take advantage of the myriad communicative tools Rhodes could have used to complain about Paul's conduct. Consequently, Rhodes was not constructively discharged.

To the extent Rhodes argues that Waffle House's refusal to transfer Rhodes to Unit # 801 was a tangible employment action, Waffle House would simply counter that the record evidence shows a complete lack of a nexus between Waffle House's decision not to transfer Rhodes and Paul's conduct. Coggins v. Government of Dist. of Columbia, 1999 U.S. App. LEXIS 2603, at *16 (4th Cir. 1999) (refusing to find discrimination because there "simply was no nexus" between alleged discriminatory conduct and termination). Rhodes admitted in her deposition that Paul had nothing whatsoever to do with the decision whether to transfer Rhodes.

Finally, even if Paul's conduct played a minor role in her decision to quit, it was not a motivating factor, and certainly not so much so as to constitute constructive discharge. See Durley v. APAC, Inc., 236 F.3d 651, 658 (11th Cir. 2000) (holding that plaintiff was not constructively discharged because she failed to establish causation); Bolden v. PRC, Inc., 43 F.3d 545, 552 (10th Cir. 1994) (finding no constructive discharge because plaintiff failed to show how his resignation was "the result of illegal discriminatory conduct"); Mayorga v. Donnelley Marketing, 70 FEP (BNA) 670, 672 (N.D. Ill. 1996) (finding no constructive discharge because plaintiff failed to show she was "compelled to resign for discriminatory reasons") (internal quotations and citations omitted). It is more likely that Rhodes' primary motivation for leaving Waffle House was her frustration with her inability to get the schedule she wanted at Unit #801. The following testimony supports such a conclusion:

-22-

Q.   Did you quit because you didn't get the transfer?

A.   No. Actually, it just like my job had panned out on me. I didn't understand why. I was a good server. I did my very best.

(Rhodes Dep. 51).

Q.   And when Charles told you that Henry didn't like the idea of a transfer and you weren't going to get a transfer, what did you do next?

A.   Well, actually – in actuality I contacted Charles again, and he said he didn't need anybody, you know. And from what I understood, he was in need of people, and I was already trained so I didn't see what the problem was. Basically, I got the runaround during that time frame. I got the runaround.

(Rhodes Dep. 52).

Q.   Well, were you suppose – where did you go? Did you go back to 801 the next day? [After last day of work at Unit #262]

A.   No. Charles didn't need me. That's what I'm in reference to. I mean, all I know is I had a family to support, and I did everything possible to maintain my job at Waffle House. I liked my job. I really did, you know, but it just seemed like I got road blocks every which way I turned.

(Rhodes Dep. 56).

Q.   Did you talk to Sheri during this period of time between August 23rd and August 29th? Did you talk to her about wanting more work or trying to get more work?

A.   No, sir. The conversation we had was if I couldn't work weekends that I was going to have to find me another job basically is what she had told me. And I was making efforts to try to remedy that situation. But, like I said, all three of us was working for Waffle House, and nobody was willing to work with me. It just seemed like a door was being closed every which way I went at that time frame.

(Rhodes Dep. 74-75).

E.    The *Faragher Defense*

1.    Waffle House Had Policies and Procedures in Place Designed to Prevent Sexual Harassment Which Rhodes Ignored

Because Rhodes did not suffer a tangible employment action, Waffle House is entitled to

assert, as an affirmative defense against liability, that:

  1.   Waffle House exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and

  2.   That Rhodes unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

See Faragher, 524 U.S. at 807.

As to the first element, there is no dispute that Waffle House had an anti-harassment policy that it communicated to its employees in several different ways. Hill v. American Gen. Fin., Inc., 218 F.3d 639, 643-44 (7th Cir. 2000) (holding that although employer's sexual harassment policies "may leave room for improvement," the policies "get the job done" because employer had a number of policies in place at the time of these events, such as an EEO Policy, another policy statement entitled "Sexual Harassment in the Workplace; Policy Regarding," and a complaint procedure setting out levels of complaints and a telephone number). Waffle House provided a copy of the policy to newly hired employees and posted the policy in the employee areas in the back of the restaurant. Waffle House even provided a toll-free phone that would receive anonymous complaints. Waffle House posted this number on the employee bulletin board and printed it on all employee pay check stubs. Having gone through the hiring process four times, with the same policies in place each time, there is no dispute Rhodes was aware of the policy.[14] Consequently,

---

[14]      Rhodes contends in her deposition that she did not recall seeing the toll-free number on the bulletin board and that one of the acknowledgment forms does not contain her signature. (Rhodes Dep. 38, 26). These assertions, however, do not raise genuine issues of material fact. First, it is undisputed that Waffle House posts the number on the employee bulletin board – plaintiff only testified that she could not "recall" seeing the number on the bulletin board. Waffle House also placed in the number on its pay check stubs, which also appeared on Rhodes' checks as well. See Reynolds v. Golden Corral Corp., 106 F.Supp. 2d 1243, 1251 (M.D. Ala. 1999) ("[The employer] need not establish [for purposes of the Faragher defense] that every employee read the posted policy to establish that it exercised reasonable efforts to communicate the procedure." Second, and more importantly, Rhodes testified that she knew harassment was not tolerated and that she should report it immediately. (Rhodes' Dep. 27).

there is no dispute that Waffle House took reasonable efforts to prevent sexual harassment by promulgating a comprehensive sexual harassment policy. See id. The first prong of the Faragher defense weighs heavily in Waffle House's favor.

>        2.    Rhodes Failed to Take Advantage of Waffle House's Policies and Procedures
>              Designed to Prevent and Remedy Sexual Harassment

Despite promulgating a policy that was as easy as picking up a phone, and despite being allegedly offended by Paul's conduct to the point she claims it forced her to quit, Rhodes did not complain a *single* time to *any* manager about Paul's conduct or use the toll-free number. Because Rhodes utterly refused to use a well-publicized policy, of which she was entirely aware, the second prong of the Faragher defense favors Waffle House. Rhodes should not be heard to complain about Waffle House's failure to investigate her "complaints," when she nothing to communicate her situation clearly and completely. Rhodes was well aware of Waffle House's harassment policy and had an obligation to give Sherrill specific information. See Lunde v. Big B, Inc., 117 F.Supp.2d 1275, 1281 (M.D. Ala. 2000) ("While the plaintiff . . . may legitimately feel uncomfortable discussion the harassment with her employer, that unpleasantness cannot excuse her failure to use the company's complaint mechanism or her obfuscation of the alleged harassment by stating that things were "pretty good."); Fiero v. Saks Fifth Avenue, 13 F.Supp. 2d 481, 492 (S.D.N.Y. 1998) ("At some point, employees must be required to accept responsibility for alerting their employers to the possibility of harassment."). Accordingly, the facts support the second prong of the Faragher defense, thereby entitling Waffle House to summary judgment.

Rhodes will no doubt contend that she did take advantage of Waffle House's harassment policy when she complained to Sherrill about Paul's "joking around." Rhodes may have told Sherrill about Paul's "joking around," but she did not give her specific details so as to put her on

notice that Paul's "joking around" was alleged sexual harassment.[15]  See Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1366 (11th Cir. 1999) ("When an employer has taken steps, such as promulgating a considered sexual harassment policy, to prevent sexual harassment in the workplace, an employee must provide adequate notice that the employer's directives have been breached so that the employer has the opportunity to correct the problem.").

It is undisputed in this case that Sherrill, the unit manager, had no direct knowledge of Paul's alleged conduct.[16]  Because Paul was a relief manager – working when Sherrill was not – the *only* way Sherrill could have discovered Paul was involved in actionable sexual harassment was if Rhodes apprized her of specific incidents.  At most, Rhodes merely told Sherrill about Paul's "joking around and embarrassing us." (Rhodes Dep. 89-90). Sherrill is not a mind reader, and such comments do little to put Sherrill, and for that matter Waffle House, on notice that Paul's joking around constituted sexual harassment.  See Reynolds, 106 F.Supp. 2d at 1252 (finding that employee's complaint did not put employer on notice of sexual harassment because she did not give supervisor sufficient facts from which he could reasonably conclude that problem involved conduct directed at plaintiff because of her sex).  Furthermore, there is also no evidence that Paul's allegedly harassing conduct was so open and notorious that Sherrill or Waffle should have had constructive knowledge of it.  Again, the alleged incidents occurred when Sherrill was not at Unit # 262.  Sherrill herself never witnessed any sexual harassing conduct by Paul nor received any complaints from other employees, about Paul's conduct.  (Sherrill Aff. ¶ 3).

---

[15]Sherrill testifies in her affidavit that Rhodes only told her that she only told her"did not like" Paul.  Such a disputed fact, however, is immaterial because even under Rhodes 'version, Sherrill was not put on notice that Paul's conduct was actionable sexual harassment.

[16]The mere fact that Sherrill allegedly knew about Paul's "trucker attitude," however, does not raise a genuine issue of material fact that Waffle House knew Paul was engaging in actionable sexual harassment.  Having a trucker's attitude (whatever that means) does not make one a sexual harasser.

-26-

## IV. CONCLUSION

The quality and quantity of evidence presented by Rhodes to support her claim of sexual harassment falls woefully short of the strict standard federal law imposes. Because Rhodes has failed to raise any genuine issues of material fact, Waffle House respectfully requests that the Court grant its motion for summary judgment.

Respectfully submitted this 20th day of June 2003.

One of the Attorneys for
SOUTHEAST WAFFLES, LLC

OF COUNSEL:

Charles B. Paterson (PAT1542)
Rhonda Mayse Garman (GAR079)
Balch & Bingham LLP
Post Office Box 78
Montgomery, Alabama 36101
Telephone:    (334) 834-6500
Facsimile:    (334) 269-3115

Christopher T. Terrell (TER017)
Balch & Bingham LLP
Post Office Box 306
Birmingham, Alabama 35201
Telephone:    (205) 226-8734
Facsimile:    (205) 488-5659

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

DEBBIE RHODES,         )
                             )
     Plaintiff,         )
                             )
vs.                        )     CASE NO. 02-A-620-N
                             )
SOUTHEAST WAFFLES, LLC, et al.,   )
                             )
     Defendants.       )

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon the following counsel of record by placing same in the United States Mail, postage prepaid and properly addressed this the 20th day of June 2003:

Richard D. Lively
969 East Main Street
Prattville, Alabama 36066

Kimberly G. Kervin
Kervin & Cook, L.L.C.
Post Office Box 680402
Prattville, Alabama 36068


_____
Of Counsel